UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 4:10CR579 CEJ |
| FRANK INGRAM, | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). The Defendant filed a motion to suppress evidence and statements. A hearing was held on the motion to suppress on February 10, 2011, and a transcript of the hearing was filed on February 24, 2011. The undersigned entered a briefing schedule, and the Government filed its response on March 10, 2011 and the Defendant filed a reply thereto on March 19, 2011.

Based upon the evidence adduced at the hearing on the motion to suppress, as well as a review of the transcript of the hearing and the post-hearing briefs of the parties, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

Matthew Karnowski is a detective with the St. Louis police department. On August 26, 2010, he was assigned to the Anti-Crime Team Task Force of the police department.

As part of their duties, each morning the Anti-Crime Team at roll call discusses possible additions to their "hot sheet." This sheet consists of vehicles used in the perpetration of felony crimes, violent and otherwise. The hot sheet contains a list of license plates of cars that are wanted

for these violations. On August 25 or 26, 2010, officers in the Anti-Crime Team received information from a police report from other St. Louis police officers of an assault that occurred in the City of St. Louis on August 24, 2010. The information given to them by other St. Louis police officers who investigated the assault was that the victim of the assault (who was a known person), entered a Dodge Charger automobile for the purpose of buying marijuana. A person in the front seat of the Dodge Charger turned around and started shooting at the victim. The victim was wounded in the leg, and attempted to flee from the vehicle by getting out of the vehicle and running down the street. The front seat passenger exited the vehicle, and fired several other shots at the victim. Thereafter, the Dodge Charger fled from the scene apparently with the front seat passenger again inside of the vehicle. There were several eyewitnesses to this incident, including the victim. These witnesses obtained a complete description of the vehicle as well as a complete license plate number that was affixed to the vehicle, and gave the descriptions and the plate number to police officers. This original incident report was written by the South Patrol Division, and, at some point prior to August 26, 2010, the South Patrol Division Detective Bureau identified Ingram as one of the occupants of the Dodge Charger.

The entire Anti-Crime Team, which consists of ten to twelve people, was made aware of the details of the shooting. Later, on August 26, 2010, Det. Karnowski and other detectives were in the area of Interstate 70 and Broadway investigating another matter, when a member of the unit observed a Dodge Charger which fit the above description of the vehicle wanted in connection with the shooting. Karnowski and another officer were able to observe a partial license plate on the vehicle, and Karnowski followed the vehicle off of the highway and onto Broadway. He eventually caught up with the vehicle after about a mile, and confirmed from the license plate and the description that

it was one and the same vehicle that was wanted for the shooting and assault. After identifying the vehicle, members of the unit notified the police helicopter, which normally monitors the frequency of the Anti-Crime Team. Karnowski and the other detectives followed the vehicle until the police helicopter radioed that it had a direct visual surveillance on the Dodge Charger. At this point, he and other detectives backed off, and allowed the helicopter to follow the Charger.

Eventually, the helicopter reported that the Dodge Charger had stopped in the 8600 block of Trafford Lane, and radioed that the only occupant of the car had just exited the vehicle. Immediately, two detectives went to the 8600 block of Trafford Lane, observed the Defendant and detained him. The two detectives handcuffed the Defendant and sat him on the curb. Karnowski arrived at the scene of the detention, approximately 30 seconds later.

Karnowski got out of his police vehicle, and asked the Defendant for his name and pedigree information. The Defendant told him his pedigree information. Karnowski also asked him to whom the vehicle belonged, and the Defendant stated that it was his girlfriend's vehicle. Karnowski then ran a computer check and wanted check on the Defendant's pedigree information. He determined that the Defendant was wanted in connection with the assault for which the Charger was on the hot sheet, and further, the Defendant was on federal supervised release for being a felon in possession of a firearm. [1]

Standard procedure for a vehicle such as the Dodge Charger was to seize the vehicle, and have it towed for an inspection of the vehicle for evidence of the assault. Because the vehicle was to be towed, department procedure also directed that an inventory search of the vehicle be made prior

---

[1] The information that the Defendant himself was specifically wanted in connection with the shooting was revealed to Karnowski for the first time by the computer check.

to it being towed. The inventory was to insure that no valuables were in the car that might otherwise be destroyed, to protect the department for liability from lost, stolen, or damaged items, and to make sure that no easily destroyable evidence or contraband was in the vehicle. Because of this, and because the car was going to be towed for further inspection, the officer started his inventory search at the front of the vehicle and worked toward the rear, per the St. Louis police department inventory policy.

Det. Karnowski first discovered cash on the front seat of the vehicle. When he reached the center console of the vehicle, he opened the console (which was not locked), and observed in plain view without moving anything around in the console, the butt of a handgun; a box of ammunition; cash; a clear knotted plastic baggie, and latex-type medical gloves. At this point, Karnowski stopped his search after finding the gun, and asked by way of radio that the Evidence Technician Unit respond to the crime scene. While waiting, Karnowski approached the Defendant and read him his full <u>Miranda</u> rights from a card. The Defendant, after hearing his rights, said he understood his rights. No threats or promises were made to the Defendant, and he did not appear to be under the influence of alcohol. His answers were coherent and appropriate. Karnowski first asked the Defendant what he knew about the gun, and the Defendant said that he did not know it was in the car until Karnowski discovered it. Karnowski then informed the Defendant that he was having the Evidence Technician Unit process the vehicle and the weapon for fingerprints, and also to test the firearm and the ammunition to determine if it contains anyone's DNA. At this point, the Defendant put his head down and said, "It's mine. Can we work out a deal to make this go away?"

The Defendant was then placed under arrest for unlawful use of a weapon, and being a felon in possession of a firearm. After the firearm was processed by the Evidence Technician Unit,

4

Karnowski checked the gun and found it to be fully loaded. The vehicle was eventually towed, even though the owner of the vehicle, the Defendant's girlfriend, arrived at the scene of the original stop.

The Defendant was conveyed to the police station by Det. Walsh. When Karnowski arrived at the station having followed Walsh, he asked the Defendant if he wished to reduce his statement to writing. The Defendant refused saying that he could not do that to himself.

## Conclusions of Law

Based on the above, the undersigned concludes that the stop of the Defendant and the search of the vehicle was based on probable cause, and is therefore lawful. Also, the undersigned notes and concludes that pursuant to the automobile exception to the warrant requirement, the Fourth Amendment does not require that police obtain a warrant to search an automobile once there is probable cause to believe the vehicle contains contraband or other evidence of criminal activity. See United States v. Ross, 456 U.S. 798, 804-809 (1982); Chambers v. Maroney, 399 U.S. 42 (1970). Further, vehicle searches are allowed even after a vehicle is towed to the police station, as long as there is probable cause to search the vehicle at the time the car was detained on the street. See Chambers v. Maroney, supra. As to probable cause, probable cause is defined as based on the totality of the circumstances, there is probable cause to believe that instrumentalities or fruits of a crime or contraband may be found at the place or item to be searched. Johnson v. United States, 333 10 U.S. (1948); Warden v. Hayden, 387 U.S. 294 (1967). The manner in which probable cause is determined is the same in both probable cause for arrest and probable cause for search. The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations

of everyday life upon which reasonable and prudent men, not legal technicians, act.

Brinegar v. United States, 338 U.S. 160, 176 (1949). Probable cause is a "fluid concept turning on the assessment of probabilities in a particular factual context--not readily or even usefully reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). Further, probable cause "must be weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Illinois v. Gates, supra at 232. Probable cause may be based on the totality of the circumstances present. In order to show probable cause for a search, all that must be shown is a "fair probability" that contraband or evidence of a crime would be found at the premises to be searched. See Illinois v. Gates, supra. It is also clear that information obtained even from unproven sources or anonymous sources may be sufficient to support a search if the information is corroborated. See Illinois v. Gates, supra; see also United States v. Briley, 726 F.2d 1301 (8th Cir. 1984) (anonymous tip from crime stopper's hotline is sufficient information upon which to create probable cause when information is corroborated).

In United States v. Ketzeback, 358 F.3d 987 (8th Cir. 2004), the affidavit for a search warrant was based on information from an untested confidential informant and excluded information from the affidavit that would poorly reflect on the informant's reliability. Further, the corroboration of the informant was largely information that might otherwise be termed as innocent or innocuous and in the public sector. In addition, another part of the corroboration was that the defendant had been convicted of a drug violation and was on probation for the violation. The Court nevertheless upheld the search warrant as stating probable cause. In upholding this as sufficient probable cause, the Court stated as follows:

> Second, the supplemental affidavit would show that the CI had recently witnessed the alleged dealer's sales, that he was able to give a description of the drugs and their packaging, and that he knew that Ketzeback had recently encountered police in a cemetery. These are detailed allegations that go beyond a "casual rumor circulating in the underworld," Spinelli v. United States, 393 U.S. 410. . .Moreover, the deputies corroborated the alleged dealer's name, address, and the details of the cemetery encounter. . .It is true, as the district court observed, that this corroborated information was publicly available and established primarily that the CI knew Ketzeback. Nevertheless, independent corroboration of even innocuous facts makes it more likely an informant is telling the truth about incriminating ones, and corroboration of innocent behavior can provide the basis for establishing probable cause.

United States v. Ketzeback, 358 F.3d 987, 991, 992. See also, United States v. Reivich, 793 F.2d 957 (8th Cir. 1986); United States v. Allen, 297 F.3d 790 (8th Cir. 2002) (information given by an informant of unknown reliability who wished to remain anonymous, was nevertheless sufficient because of the detailed nature of the information).

In addition, individuals who come forward, give their names and identify themselves to police have enhanced credibility as they are witnesses who are also citizens. These citizens do not seek to hide their identity, but are giving information to the police based on their observations of a crime taking place. These individuals have been determined to be more credible for this very reason. Further, in United States v. Christmas, 222 F.3d 141 (4th Cir. 2000) the Court stated as follows:

> Unlike the anonymous tipster, a witness who directly approaches a police officer can also be held accountable for false statements. As the Supreme Court has observed, citizens who personally report crimes to the police thereby make themselves accountable for lodging false complaints. . . Here, the informant provided her home address to officers. In doing so, the informant exposed herself to repercussions of misleading or deceiving the police.
>
> All these factors make the information provided in this case more trustworthy and reliable than the anonymous tip at issue in *J.L.* Indeed, courts have had no difficulty distinguishing between cases involving face-to-face encounters with informants and cases involving anonymous tipsters. . .

222 F.3d 141, 144.

Based on the above, the undersigned concludes that the officers had probable cause to stop the vehicle and to search it for contraband at the time it was observed in the 8600 block of Trafford. The officers were aware that citizens had been interviewed by police officers, that these citizens' names were known to the police officers, and that these citizens had witnessed the felony crime of assault with intent to kill in a shooting involving the vehicle which was stopped and searched. The shooting had taken place less than two days before the stop and search of the vehicle, and there was little or no doubt that the vehicle was instrumental in the crime being committed. Information both from the victim and the witnesses was that the victim was shot in the leg by an occupant of the vehicle while the Defendant was seated in the backseat and the perpetrator seated in the front seat. Several shots were fired at the victim according to both the victim and witnesses. Therefore, based on the above eyewitness accounts to police, the undersigned concludes the police had probable cause to believe that a search of the vehicle would yield evidence of a crime. There was at least "a fair probability" that a search of the car could reveal bullet holes in the back seat, blood in the back area of the car, recovered cartridges from the seat of the car, and possibly recovery of the firearm used in the vehicle and in the shooting. Thus, the undersigned concludes, it was likely that evidence of the firing of a firearm in a vehicle and the wounding of an individual would still be present two days after the criminal activity.[2] Therefore, the undersigned concludes that the stop of the car and the search of it is based on probable cause, and is, therefore, lawful.

---

[2] Officers may rely on information obtained from colleagues such as other police officers in assessing probable cause. The collective knowledge of all of the officers determines the probable cause. See United States v. Chavez, 534 F.3d 1338 (10th Cir. 2008); United States v. Williams, 429 F.3d 767 (8th Cir. 2005).

In addition, the undersigned concludes that the officers had reasonable suspicion to detain the defendant who was driving the car at least to determine the ownership of the vehicle, and to obtain his pedigree information. Based on the same facts, that he was seen driving a car used in a shooting less than 48 hours before his stop, leads the undersigned to conclude that under Terry v. Ohio, 392 U.S. 1 (1968), there was sufficient reasonable suspicion to detain the Defendant to determine his identity and relationship to the vehicle. Further, based on the unique factual situation above, the undersigned concludes that the use of handcuffs to detain the Defendant while he was being questioned as to his identity and his relationship to the car did not convert the Terry stop into an arrest at that point. In United States v. Navarrete-Barron, 192 F.3d 786 (8th Cir. 1999), the Court held that the elements of a Terry stop were not exceeded by the use of handcuffs, given the dangerous nature of the suspected crime of drug trafficking and the good possibility that the driver or passenger had a weapon. In the case now at bar, the undersigned concludes that there was a specific risk that the driver of the vehicle would be armed or that weapons would be found in the vehicle. Two days prior to the stop, the vehicle was used in a shooting in which a person was wounded and several shots were fired on the street where witnesses were present. Thus, the crime was of a "dangerous nature" and the officers asked only two questions of the Defendant; his name, date of birth, pedigree information, and who owned the car. Other than handcuffing the Defendant, no threats or promises were made to him, and he was not physically threatened or abused in any way. Therefore, based on the above, the undersigned concludes that the Defendant need not have been given Miranda rights prior to police asking these limited questions, and that the statements were voluntarily made. Therefore, they should not be suppressed. Berkemer v. McCarty, 468 U.S. 420 (1984); California v. Beheler, 463 U.S. 1121 (1983).

As to other statements in this case, the undersigned concludes that they were made after the Defendant was fully advised of his rights, stated he understood his rights, and, according to the evidence, talked to the police officers and answered their questions of his own volition. The evidence showed that he was not threatened in any way nor was he promised anything in return for his statements. Based on the above, the undersigned concludes that the Defendant's statements made after his formal arrest were made after the Defendant had been advised of his rights, waived his rights, and they were voluntary. See Miranda v. Arizona, 384 U.S. 436, 467-75 (1966); North Carolina v. Butler, 441 U.S. 369 (1979); Colorado v. Connelly, 479 U.S. 157 (1986); Moran v. Burbine, 475 U.S. 412 (1986).

## Conclusion

Therefore, based on the above, the Defendant's motion to suppress evidence and statements should be denied.

\* \* \*

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Motion of Defendant to Suppress Evidence and Statements [Doc. #17] should be **denied**.

Further, the parties are advised that they have fourteen (14) days, in which to file written objections to this recommendation and determination. Failure to timely file objections may result

in waiver of the right to appeal questions of fact.  Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

                                                 /s/ Terry I. Adelman
                                   UNITED STATES MAGISTRATE JUDGE

Dated this  29th  day of April, 2011.